## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MAWA INC., | : | |
| Plaintiff. | : | CIVIL ACTION |
| | : | No. 15-6025 |
| v. | : | |
| UNIVAR USA INC., | : | |
| Defendant. | : | |

**May_19, 2016**                                                   **Anita B. Brody, J.**

### MEMORANDUM

Plaintiff MAWA Inc. ("MAWA") brings suit against Defendant Univar USA Inc. ("Univar"), alleging claims of negligence, negligent hiring, negligent supervision, and negligent failure to train.  I exercise diversity jurisdiction over MAWA's claims pursuant to 28 U.S.C. § 1332.  Univar moves for judgment on the pleadings against MAWA.  For the reasons set forth below, I will grant Univar's motion.

## I. BACKGROUND[1]

Plaintiff "MAWA is certified by the Department of Transportation [("DOT")] under Federal Regulation CFR 49 to engage in the business of qualifying DOT approved containers as well as the cleaning and decommissioning of DOT approved containers that were used to store hazardous chemicals."  Compl. ¶ 5.  Defendant Univar is in the business of distributing chemicals and chemistry related products and services.  *Id.* ¶ 6; Ex. B.

Univar shipped approximately four hundred one-ton containers that previously contained chlorine and sulfur dioxide to MAWA for final decommissioning.  *Id.* ¶ 7; Ex. A.  Univar represented that a "Vacuum Process" had removed all residual chemicals from the containers.

---

[1] All facts are taken from the Complaint and the exhibits attached to it.

*Id.* ¶ 10.  The Vacuum Process requires a container to be chilled in order to reduce the temperature and convert vapor to a liquid that can be suctioned out of the container.  *Id.* ¶ 11.  Once the liquid and any remaining vapor are removed, the container is left with a negative pressure.  *Id.* ¶¶ 12, 13.  "In order for a container to be considered vacuum sealed, a 'sniff gauge' must read[] a minimum of -5 to -10 inches of Mercury (Hg) negative pressure."  *Id.* ¶ 16.

Univar's "Operating Procedures" for the evacuation of chlorine and sulfur dioxide cylinders contained several steps to ensure that all residual chemicals were removed from each container and it was vacuum sealed.  For instance, the Operating Procedures "require[d] -10 inches of Hg negative pressure prior to removing chlorine from the container," *id.* ¶ 18, and "a manual check for vacuum," *id.* ¶ 19 (internal quotation marks omitted).  "As an additional fail-safe, the Operating Procedures state[d] that if the 'vacuum is not below -5 inches of mercury [Hg],' not to disconnect the cylinder and call maintenance."  *Id.* ¶ 20 (internal quotation marks omitted).

On April 23, 2015, MAWA's employee, Tim Torrens, began working on the final decommissioning of one of the containers shipped from Univar.  *Id.* ¶ 22.  The container had a label "HAS A VACUUM FOR SCRAP," a representation by Univar that the container was vacuum sealed and all residual chlorine and sulfur dioxide gases had been removed.  *Id.* ¶¶ 14, 24; Ex. C.  Before doing any work, Torrens visually inspected the container, confirmed that it was not damaged, and certified that it had a vacuum seal label.  *Id.* ¶ 28.  As part of the decommissioning process, Torrens put water inside the container.  *Id.* ¶ 29.  Although the container was supposed to be empty, when Torrens filled the container with water, the water mixed with residual chlorine to create hydrochloric acid.  *Id.* ¶ 30.  When Torrens removed the plug from the container to drain the water, the container expelled hydrochloric acid.  *Id.* ¶ 31.

2

The hydrochloric acid drifted into MAWA's facility and damaged most of MAWA's inventory and equipment. *Id.* ¶¶ 33, 34. As a result, MAWA could not operate its facility for twelve business days, and incurred significant costs. *Id.* ¶¶ 35, 36. Despite Univar's assurances, the container was not properly vacuum sealed and contained residual chlorine. *Id.* ¶ 8.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed--but early enough not to delay trial--a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment will only be granted where the moving party clearly establishes there are no material issues of fact, and that he or she is entitled to judgment as a matter of law." *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 259 (3d Cir. 2008). There is "no material difference in the applicable legal standards" for a motion for judgment on the pleadings under Rule 12(c) and a motion to dismiss under Rule 12(b)(6). *Spruill v. Gillis*, 372 F.3d 218, 223 n.2 (3d Cir. 2004).

"As with a Rule 12(b)(6) motion, [a] [c]ourt 'view[s] the facts alleged in the pleadings and the inferences to be drawn from those facts in the light most favorable to the plaintiff.'" *Mele v. Fed. Reserve Bank of New York*, 359 F.3d 251, 253 (3d Cir. 2004), as amended (Mar. 8, 2004) (quoting *Leamer v. Fauver*, 288 F.3d 532, 535 (3d Cir.2002)). To survive dismissal, a complaint must allege facts sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.  However, an exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered . . . ."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis omitted) (citations omitted) (internal quotation marks omitted).  Thus, a court may "consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case."  *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994).  Further, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

## III. DISCUSSION

Univar contends that MAWA's claims are expressly preempted by the Hazardous Materials Transportation Act ("HMTA"), 49 U.S.C. §§ 5101-5128.  MAWA argues that the HMTA does not expressly preempt its claims.

The Supremacy Clause of the United States Constitution elevates federal law above the law of the states, U.S. Const. art. VI, cl. 2, and grants Congress "the power 'to preempt state legislation if it so intends.'"  *Deweese v. Nat'l R.R. Passenger Corp. (Amtrak)*, 590 F.3d 239, 245 (3d Cir. 2009) (quoting *Hi Tech Trans, LLC v. N.J. Dep't of Envtl. Prot.*, 382 F.3d 295, 302 (3d Cir.2004)).  There are three types of preemption: express preemption, field preemption, and implied conflict preemption.  *Bruesewitz v. Wyeth Inc.*, 561 F.3d 233, 238-39 (3d Cir. 2009) (citing *Hillsborough Cty., Fla., v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)).

 "A federal enactment expressly preempts state law if it contains language so requiring."  *Id.* at 239.  Section 5125(b)(1) of the HMTA contains the following express preemption

provision:

> [U]nless authorized by another law of the United States, a law, regulation, order, or other requirement of a State, political subdivision of a State, or Indian tribe about any of the following subjects, that is not substantively the same as a provision of this chapter, a regulation prescribed under this chapter, or a hazardous materials transportation security regulation or directive issued by the Secretary of Homeland Security, is preempted[.]

49 U.S.C. § 5125(b)(1).  The section then enumerates the five subject areas that are expressly preempted by the HMTA:

> (A) the designation, description, and classification of hazardous material.
>
> (B) the packing, repacking, handling, labeling, marking, and placarding of hazardous material.
>
> (C) the preparation, execution, and use of shipping documents related to hazardous material and requirements related to the number, contents, and placement of those documents.
>
> (D) the written notification, recording, and reporting of the unintentional release in transportation of hazardous material and other written hazardous materials transportation incident reporting involving State or local emergency responders in the initial response to the incident.
>
> (E) the designing, manufacturing, fabricating, inspecting, marking, maintaining, reconditioning, repairing, or testing a package, container, or packaging component that is represented, marked, certified, or sold as qualified for use in transporting hazardous material in commerce.

*Id.* § 5125(b)(1)(A)-(E).  "It is obvious from the face of the statute that § 5125(b)(1) expressly preempts non-federal requirements that relate to, or are 'about,' the five subject areas set forth in § 5125(b)(1)(A)–(E)."  *Roth v. Norfalco LLC*, 651 F.3d 367, 375 (3d Cir. 2011).

The existence of an express preemption provision does not however end the inquiry because a court "must nonetheless 'identify the domain expressly pre-empted' by that language." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996) (quoting *Cipollone v. Liggett Grp., Inc.,* 505 U.S. 504, 517 (1992)).  While "analysis of the scope of the pre-emption statute must begin with

5

its text, . . . that interpretation is informed by two presumptions about the nature of pre-emption." *Id.* at 484-85. "First, 'the purpose of Congress is the ultimate touchstone in every pre-emption case.'" *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic*, 518 U.S. at 485)). Second, a court "'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Id.* (quoting *Medtronic*, 518 U.S. at 485)). "This second guiding principle is often referred to as a 'presumption against preemption . . . .'" *Roth*, 651 F.3d at 375 (quoting *Deweese*, 590 F.3d at 246). The presumption against preemption may be overcome if the preemptive scope of the statute is clear. *Id.*

In discerning Congress' intent, "[t]he plain wording of the preemption provision is of paramount importance, for this 'necessarily contains the best evidence of Congress' pre-emptive intent.'" *Id.* (quoting *Chamber of Commerce v. Whiting*, 563 U.S. 582, 131 S. Ct. 1968, 1977 (2011)). A court may also consider the structure and purpose of a statute, the larger regulatory scheme, and may examine legislative history if uncertainty remains. *Id.*

Section 5125(b)(1) is "an expansive preemption provision," that "preempts all non-federal laws, regulations, orders, or requirements that are 'not substantively the same as' corresponding federal regulations." *Id.* at 376. At the outset, a court must identify the contours of the non-federal laws, regulations, orders, or requirements that are in question in the case. *Id.* A court must then determine: (1) whether § 5125(b)(1) applies to the non-federal laws, regulations, orders, or requirements at issue; and (2) whether these laws, regulations, orders, or requirements are "substantively the same as" the conditions imposed by the HMTA. *Id.*

The Third Circuit's decision in *Roth* provides a useful framework for analyzing whether MAWA's common law claims are expressly preempted by the HMTA. In *Roth*, the plaintiff,

David Roth, suffered injuries when he attempted to unload a railway tank car filled with sulfuric acid that exploded across his face and chest. 651 F.3d at 370. The defendant, Norfalco, delivered the sulfuric acid by rail to Roth's employer. *Id.* at 372. On the day that Norfalco delivered the tank cars of sulfuric acid, Roth was attempting to unload the tank car in question when he experienced mechanical difficulty. *Id.* at 372. Roth's supervisor instructed him to move on to another tank car. *Id.* Roth obeyed, but did not remove the elbow pipe from the first tank car. *Id.* Two days later, as Roth started to detach the pipe, acid burst from the tank car onto his body. *Id.*

Roth brought suit against Norfalco, asserting common law claims of negligence, strict liability, products liability, and breach of warranty based on Norfalco's duty to design a tank car that was safe to unload. *Id.* Norfalco argued that Roth's claims were preempted by § 5125(b)(1) of the HMTA. *Id.* at 370. Although Roth "pleaded under ostensibly distinct common law theories," the Third Circuit discerned that Roth's claims all sought the same thing—"to impose a design requirement that, if successful, would require Norfalco to install an additional safety valve and pressure gauge on each of its tank cars." *Id.* at 376. Accordingly, the Third Circuit concluded that Roth's common law claims constituted non-federal requirements under the HMTA. *Id.*

The Third Circuit then concluded that § 5125(b)(1) applied to Roth's design requirement claims because one of the subject areas expressly preempted by the HMTA under § 5125(b)(1)(E) "concerns the 'design[]' of a 'package, container, or packaging component that is . . . qualified for use in transporting  hazardous materials in commerce.'" *Id.* (quoting 49 U.S.C. § 5125(b)(1)(E). Roth argued that the HMTA did not apply because the tank car was no longer in transport and Norfalco had already made its delivery and departed at the time of the accident.

The Third Circuit rejected Roth's argument: "It is irrelevant what Roth was doing at the precise moment of his injury. This only makes sense, for it cannot be the case that the comprehensive design requirements erected by the HMTA cease to govern simply because the tank car was emptied of its contents days after its delivery." *Id.* at 380.  Thus, § 5125(b)(1) applied to Roth's claims because they sought to impose a tank car design requirement and "[t]he tank car is, at all times, a container qualified for use in transporting hazardous materials." *Id.*

Lastly, the Third Circuit concluded that the tank car design requirements sought by Roth were not "substantively the same as" the HMTA because they would impose conditions beyond those required by the federal regulatory scheme. *Id.* at 377.  Based on the plain meaning of § 5125(b)(1), the Third Circuit held that Roth's claims were expressly preempted by the HMTA. *Id.*  The Third Circuit did not need to delve further to determine Congress' intent because the text of the preemption provision was clear. *Id.*  Nonetheless, the Third Circuit observed that the structure and underlying purposes of the HMTA bolstered its conclusion. *Id.*

Similar to *Roth*, MAWA brings several common law tort claims against Univar.  MAWA brings claims of negligence, negligent hiring, negligent supervision, and negligent training based on Univar's alleged failure to properly follow a specific set of procedures for how to vacuum seal and label the containers.  While MAWA "plead[s] under ostensibly distinct common law theories," *Roth*, 651 F.3d at 376, all of MAWA's claims seek the same thing—to impose on Univar a specific set of handling, testing, maintaining, and labeling requirements for the containers it prepared for transport to MAWA.  Accordingly, MAWA's common law claims constitute non-federal requirements under the HMTA. *See id.*

If § 5125(b)(1) applies to MAWA's non-federal requirements and they are not "substantively the same as" the conditions imposed by the HMTA, then they will be preempted

by the HMTA.  *See id.*  Univar contends that § 5125(b)(1)(B) applies to MAWA's non-federal requirements for the transportation of the containers and that MAWA's requirements are not "substantively the same as" the conditions imposed by the HMTA.  MAWA counters that its suit does not touch on Univar's transportation of the containers, but rather focuses on the decommissioning of the containers for scrap, a task not covered by the HMTA.

The HMTA defines "transportation" as "the movement of property and loading, unloading, or storage incidental to the movement."  49 U.S.C. § 5102(13).  The HMTA empowers the Secretary of Transportation to "prescribe regulations for the safe transportation, including security, of hazardous material in intrastate, interstate, and foreign commerce."  *Id.* § 5103(b)(1).  "Pursuant to this authority, the Department of Transportation ("DOT") promulgated a set of rules known as the Hazardous Materials Regulations ("HMR")."  *Roth*, 651 F.3d at 371 (citing 49 C.F.R. §§ 171–180.605).  "The scheme erected by the HMTA/HMR is thus controlling during the interstate movement of hazardous materials, and also at various stages before and after said movement."  *Id.* (citing 49 C.F.R. § 171.1(a)-(c)). Pre-transportation functions include, among others:

> (1) Determining the hazard class of a hazardous material.
>
> (2) Selecting a hazardous materials packaging. . . .
>
> (4) Securing a closure on a filled or partially filled hazardous materials package or container or on a package or container containing a residue of a hazardous material.
>
> (5) Marking a package to indicate that it contains a hazardous material.
>
> (6) Labeling a package to indicate that it contains a hazardous material.

49 C.F.R. § 171.1(b).

Section 5125(b)(1)(B) expressly preempts transport-related "packing, repacking,

handling, labeling, marking, and placarding of hazardous material."  49 U.S.C. § 5125(b)(1)(B).

Chlorine is a "hazardous material."  49 C.F.R. § 172.101.  Containers that have only a residue of

hazardous material are subject to the requirements of the HMTA/HMR.  49 C.F.R. § 173.29(a)

("[A]n empty packaging containing only the residue of a hazardous material shall be offered for

transportation and transported in the same manner as when it previously contained a greater

quantity of that hazardous material.").

 MAWA argues that the express preemption provision in § 5125(b)(1) does not apply to

its claims because this suit involves an injury that resulted during the post-transportation

decommissioning of the containers for scrap, a task not covered by the HMTA.  As determined

in *Roth*, however, it is "irrelevant" what Torrens, MAWA's employee, was doing "at the precise

moment of [the] injury."  *Roth*, 651 F.3d at 380.  MAWA seeks to hold Univar liable for its pre-

transportation failure to properly vacuum seal and label containers that had residual amounts of

chlorine.  Section 5125(b)(1)(B) applies to Univar's pre-transportation packing, handling and

labeling of the containers that had residual amounts of chlorine, a listed hazardous material.  The

HMTA's requirements for the packing, handling, and labeling of containers do not cease to apply

simply because Torrens was beginning the decommissioning process at the time of the injury.

*See id.* ("[I]t cannot be the case that the comprehensive design requirements erected by the

HMTA cease to govern simply because the tank car was emptied of its contents days after its

delivery.").  Accordingly, § 5125(b)(1) applies to the non-federal requirements that MAWA

seeks to impose on Univar.

 The last question to resolve is whether MAWA's non-federal requirements are

"substantively the same as" the requirements mandated by the HMTA/HMR.  "A non-federal

requirement is 'not substantively the same' unless it 'conforms in every significant respect to the

Federal requirement.'"  *Roth*, 651 F.3d at 377 (quoting 49 C.F.R. § 107.202(d)).  MAWA seeks

to impose the following non-federal requirements on Univar, regarding the Vacuum Process for

containers prior to transport: (1) chilling a container so that any vapor becomes a liquid; (2)

suctioning out the liquid, removing the vapor, and leaving the container with a negative pressure;

(3) using a sniff gauge to test for a reading of -5 to -10 inches of Mercury (Hg) negative

pressure; (4) performing a manual check for vapor; and (5) affixing a vacuum seal label.  These

non-federal requirements impose conditions beyond those imposed by the HMTA/HMR.

MAWA's common law claims, which seek to impose requirements that are not "substantively

the same as" the requirements mandated by the HMTA/HMR, are expressly preempted under the

plain meaning of § 5125(b)(1).

 Because the text of the provision is clear, it is not necessary to further explore Congress'

preemptive intent.  *See Roth*, 651 F.3d at 377.  Nonetheless, as concluded in *Roth*, the structure

and underlying purposes of the HMTA lend additional support to the conclusion that §

5125(b)(1) expressly preempts MAWA's claims.  *See id.*

 In 1975, Congress enacted the HMTA.  "Its overriding purpose was to develop 'a

uniform, national scheme of regulation regarding the transportation of hazardous materials.'"

*Roth*, 651 F.3d at 370 (quoting *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 674 (D.C.

Cir.2005)).  As it was initially enacted, the preemption provision of the HMTA only preempted

state or local requirements that were "inconsistent" with the federal regulations.  *Id.* at 378

(citing Transportation Safety Act of 1974, Pub. L. No. 93–633, § 112, 88 Stat. 2156).  "This,

thought the Senate Committee on Commerce, would serve 'to preclude a multiplicity of State

and local regulations and the potential for varying as well as conflicting regulations in the area of

hazardous materials transportation.'"  *Id.* (quoting S. Rep. No. 93–1192, at 37).  Non-federal

requirements, however, continued to proliferate.  *Id.*  Fifteen years later, Congress amended the

HMTA and expanded its preemptive scope based on its findings that:

> (3) many States and localities have enacted laws and regulations which vary from
> Federal laws and regulations pertaining to the transportation of hazardous
> materials, thereby creating the potential for unreasonable hazards in other
> jurisdictions and confounding shippers and carriers which attempt to comply with
> multiple and conflicting registration, permitting, routing, notification, and other
> regulatory requirements,
>
> (4) because of the potential risks to life, property, and the environment posed by
> unintentional releases of hazardous materials, consistency in laws and regulations
> governing the transportation of hazardous materials is necessary and desirable,
>
> (5) in order to achieve greater uniformity and to promote the public health,
> welfare, and safety at all levels, Federal standards for regulating the transportation
> of hazardous materials in intrastate, interstate, and foreign commerce are
> necessary and desirable[.]

Hazardous Materials Transportation Uniform Safety Act of 1990, Pub. L. No. 101–615, § 2, 104

Stat. 3244, 3245 (1990).  In 2005, Congress re-adopted these findings and again amended the

HMTA.  Hazardous Materials Transportation Safety and Security Reauthorization Act of 2005,

Pub. L. No. 109–59, § 7101, 119 Stat. 1144, 1891 (2005).

"The HMTA preemption provision was, and is, the linchpin in Congress' efforts to

impose nationwide regulatory uniformity." *Roth*, 651 F.3d at 378.  "[T]here is nothing in the

HMTA to indicate that Congress did not wish to preempt state common law requirements." *Id.*

at 378-79.  The structure and underlying purposes of the HMTA confirm that § 5125(b)(1) is "a

robust preemption provision that leaves little, if any, room for non-federal regulation." *Id.* at

379.

Relying on *Delaware & Hudson Railway Co., Inc. v. Knoedler Manufacturers, Inc.*, 781

F.3d 656 (3d Cir. 2015), MAWA makes two final arguments why its common law claims are not

expressly preempted by the HMTA.  First, MAWA argues that, in addition to pleading violations

of non-federal requirements, it has pled violations of the HMTA/HMR that may be enforced through common law negligence.  MAWA contends that its common law claims are not subject to preemption because they allege violations of federal duties based on the HMTA/HMR.  *See Knoedler*, 781 F.3d at 662 (holding that the Locomotive Inspection Act ("LIA") does not preempt a state law claim premised on federal duties and standards of care imposed by the LIA itself).

MAWA highlights the following two allegations in its Complaint to demonstrate that it has alleged Univar violated duties under the HMTA/HMR: (1) "Univar's failure to accurately label the container and negligent failure to properly remove all chlorine caused Plaintiff significant damages," Compl. ¶ 26; and (2) "When Torrens filled this particular container with water, the residual chlorine, that Univar failed to empty from the container, mixed with the water to create hydrochloric acid," Compl. ¶ 30; *see also* Pl.'s Resp. 8.  These allegations, however, do not refer to the HMTA/HMR or any violation of federal duties.  In fact, the entire Complaint is devoid of mention of the HMTA/HMR or any violation of federal duties.

Second, MAWA argues that its claims should not be preempted because they are based on Univar's failure to follow its internal Operating Procedures.  MAWA contends that Univar's Operating Procedures for the evacuation of chlorine and sulfur dioxide cylinders constitute voluntarily assumed duties that are not preempted by the HMTA.

In *Knoedler*, the Third Circuit held that the LIA's field preemption did not preempt breach of contract claims "because breach-of-contract claims involve voluntarily assumed duties as opposed to duties imposed by state law."  781 F.3d at 667.  In reaching this decision, the Third Circuit recognized that "[t]here is a salutary 'you've made your own bed, now lie in it' quality to several cases from the Supreme Court that emphasize the importance of voluntarily assumed

13

contractual obligations."  *Id.* at 668.  The Third Circuit explained: "[W]hen a party to a contract voluntarily assumes an obligation to proceed under certain state laws, traditional preemption doctrine does not apply to shield a party from liability for breach of that agreement."  *Id.* at 667-68 (internal quotation marks omitted).  MAWA, however, does not raise a breach of contract claim in the Complaint.

*Knoedler* is inapplicable to MAWA's suit because MAWA has not pled any claims based on breach of contract or violation of the HMTA/HMR.  Therefore, it is unnecessary to explore whether the HMTA would preempt such claims.  Based on the plain language of § 5125(b)(1), as well as the structure and underlying purposes of the HMTA, MAWA's common law claims are expressly preempted.

## IV. CONCLUSION

I will grant Univar's motion for judgment on the pleadings because MAWA's common law claims are expressly preempted by the HMTA.


s/Anita B. Brody

_____

ANITA B. BRODY, J.




Copies **VIA ECF** on _____ to:                Copies **MAILED** on _____ to: